FRANK TURNER, Defendant in Error, *vs.* THE MANUFAC-TURER'S AND CONSUMER'S COAL COMPANY, Plaintiff in Error.

*Opinion filed April 18, 1912.*

RELEASE—*when release cannot be impeached in action at law.* If a party is mentally incompetent to know what he is doing or is deceived or tricked into signing a release when he thought he was signing something else, such facts may be shown in his action at law for damages, and the release is not a bar to the action; but if he is mentally capable of knowing and understanding what he is doing, and does know and understand that he is making a settlement of his claim for damages, the release must be set aside in equity before an action at law for damages can be maintained.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Macon county; the Hon. WILLIAM C. JOHNS, Judge, presiding.

F. J. CANTY, LEFORGEE, VAIL & MILLER, and GEORGE W. MILLER, for plaintiff in error.

McGINLEY & WILEY, for defendant in error.

Mr. JUSTICE FARMER delivered the opinion of the court:

This case is brought to this court upon a writ of *certiorari* to review the judgment of the Appellate Court for the Third District affirming a judgment of the circuit court of Macon county in an action brought by defendant in error to recover damages from plaintiff in error for injuries received in the coal mine of plaintiff in error. The first three counts of the declaration are for common law negligence, and charged that plaintiff in error negligently failed and refused to furnish defendant in error with a safe place to work; that plaintiff in error negligently permitted large quantities of gas to accumulate in its mine, of which defendant in error was ignorant, and that while he was in the exercise of due care for his own safety he was severely burned by an explosion, caused by his lamp coming in contact with the gas. The other four counts charge willful failure upon the part of plaintiff in error to comply with certain requirements of sections 18 and 19 of the Mines and Miners act, by reason of which it is alleged the injury occurred.

Defendant in error was employed in the mine of plaintiff in error as a "roustabout" or "company man," and was engaged in cleaning up roads, tracks and passageways. At the time of his injury he was working on the night shift, and he and his buddy, Tanzius, were directed by plaintiff in error's foreman to clean up a fall that had occurred some time previous in the third south off the main entry. Near the place where the fall occurred was the first room of the third south off the fifth west passageway, which was no longer used for mining purposes. After filling one or two places in other parts of the mine, defendant in error and Tanzius selected this room as the next place in which to throw the refuse, or "gob." The room had been excavated a distance of about one hundred and twenty-five feet and rails had been laid from the entry to the face of the coal. About two or three months prior to the injury of defend-

ant in error a fall occurred in the roof of this room, leaving a pocket in the roof, in which gas accumulated. The room was abandoned for digging coal and was partially filled, next to the face of the coal, with slate, stone and dirt. About two weeks before the injury the rails were removed from the room except from sixteen to twenty feet at the entrance and a tie was placed across the end of the track. The distance from the end of the track to the hole in the roof was variously estimated by the witnesses at from thirty to seventy feet. The mine manager wrote on the tie, with chalk, "Gas in the hole; don't go by this tie." The word "gas," and according to the testimony of the mine manager the word "dangerous," also, were written on a slab or cap-piece at the neck or entrance to the room. At about four or five o'clock on the morning of the 29th of October, 1907, defendant in error and his buddy, Tanzius, pushed a car loaded with gob into said room 1 as far as the end of the rails, removed the tie that had been placed across the end of the rails, and defendant in error stepped into the room beyond the end of the rails and began unloading the car while Tanzius returned to load another car. To unload the car defendant in error testified he stood at the end of the car farthest in the room, and when he lifted a shovelful of dirt from the car he stepped four or five feet further into the room and threw the dirt as far as he could. While thus engaged the explosion occurred, seriously burning and injuring him.

At the close of the evidence for defendant in error the plaintiff in error moved the court to direct a verdict in its favor, and again made the same motion at the conclusion of all the evidence. These motions were denied. The jury found for defendant in error, and the court overruled a motion for a new trial and rendered judgment on the verdict, which judgment was affirmed by the Appellate Court.

The principal errors assigned are upon the action of the court in denying plaintiff in error's motions to direct a ver-

dict, the rulings of the court on the admission and exclusion of testimony, and in giving and refusing instructions. In the view we take of this case it is unnecessary to determine whether defendant in error made a case by his proof that would, in the absence of a release of the cause of action, have justified submission of it to a jury, or to pass upon the errors assigned upon the court's action in admitting and rejecting testimony or giving and refusing instructions, except as hereinafter mentioned.

On the trial of the case plaintiff in error introduced in evidence a release and settlement of the cause of action. The release is as follows:

"I, Frank Turner, hereby acknowledge payment to me in hand this day by Manufacturers' and Consumers' Coal Co. of the sum of four hundred eighty-seven 50/100 dollars, in full settlement of all my claims or demands which I now have or hereafter may have against the said payor Manufacturers' and Consumers' Co. on account of an accident which occurred to me on or about the 29th of October, 1907, causing injury to me.

"In testimony whereof I have hereunto set my hand and seal this eleventh day of January, 1908.

"Witness my mark. FRANK X his mark TURNER. [Seal.]

Witnesses to Frank Turner's mark: John Muncie, Tyler Meriweather.

"The foregoing agreement was read by Frank Turner, who said that he understood it; that he knew that in signing it he was signing away his right to further claim for the injuries therein referred to; that he was satisfied with the settlement, and that he signed it of his own free will.

O. K.—M. & C. LEWIS OVERHOLT,
JOHN MUNCIE,
TYLER MERIWEATHER."

To impeach the release defendant in error attempted to show that when he signed it his mental condition was such that he did not know and understand what he was doing or what he signed. Defendant in error and four witnesses testified upon this subject, but the testimony of three of said witnesses was stricken out by the court and the jury were told to disregard it. Defendant in error (who will

be referred to in the testimony as Turner) testified, on direct examination, that after being injured he was taken to St. Mary's Hospital.    He first remembered being attended by Dr. Meriweather two weeks afterward, and the doctor continued to attend him until June 2.    The only thing he remembered happening the day the release was signed was a knock at his door, and Overholt, (the plaintiff in error's superintendent,) Dr. Meriweather and a man named Muncie came into the room.    The Sister attending him as nurse stepped outside into the hall.    Overholt asked him how he was feeling, and he replied not very well; that his ears were bothering him, and one of them had been lanced about thirteen times.    He testified his face and hands were bandaged, his eyes covered and he was in bed; that before that he had been sitting up once or twice, about an hour at a time. Overholt said he had a paper he wanted him to sign; that the company was not liable for the accident that happened to him, but would pay his hospital and doctor bills for five months longer, give him transportation to his home in Canada and return, and give him a job when he came back. Turner said he was not in a condition to see or read at the time and does not remember seeing the paper; that Overholt, Dr. Meriweather and Muncie were there about an hour and a half; that he was sometimes in a condition to hear readily everything going on in the room.    They read the paper over to him once, but he could not hear and understand everything that was read.    He was able to read and write before he was injured but could not do so the day the paper was signed.    He was suffering a good deal and was not in a condition to transact the ordinary business of life.    On cross-examination he testified he was in the hospital two months and a half before the release was signed. Overholt had been to see him once, three or four days before he brought the paper.    Another man was with Overholt.    They stayed about an hour and talked with him about a settlement with the coal company.    He told them he was

not ready to settle and refused to make a settlement. The day the settlement was made Overholt started the conversation. He said he had come down to make a settlement; that the coal company did not regard itself in any way liable, and told Turner what he would give him. Turner testified it seemed to him he at first told Overholt the offer was not enough. Overholt offered him more on that occasion than he did a few days before, but Turner still said it was not enough. Overholt read the paper, and Turner said it seemed to him Overholt wanted him to sign it. Dr. Meriweather went out of the room, and at the time he left the room Turner had not agreed to a settlement. Muncie remained in the room. Overholt continued talking about a settlement and Turner refused to make it. Overholt said in his opinion the company was not liable. Turner asked to talk to the Sister who was caring for him, about it. She came into the room. He told her what the parties wanted and asked her whether he would better sign up and settle, but does not remember what she said nor what he then said to Overholt, but it seemed to him he indicated in some manner that he would settle. He couldn't tell whether the paper was read to him when the Sister was in the room or whether she was present when he signed it. It was read to him once and he put his mark on the paper. He did not remember whether it was done with a pen or pencil nor who was in the room when he signed it. The three parties mentioned were there about an hour and a half, and all the time one or more of them were talking to him trying to effect a settlement and requesting him to make a settlement and sign the paper. He did not think he told Overholt he did not understand the paper when it was read to him or ask him any questions about it. The paper read to him, if he was not mistaken, had the same words in it as the paper read to the jury on the trial. On re-direct examination he testified his memory was pretty poor at the time the release was signed; that Dr. Meriweather came to the end of the

bed while Overholt was talking, and said: "Where am I to get my money out of this? You have got to sign this paper or I will quit waiting on you," to which he made no reply.

John W. Preihs testified he visited Turner some time in December and again January 9. He described Turner's appearance and physical condition on his first visit and said he put several questions to him but received no reply. He would grunt or make a motion, but witness could not understand him. On the second visit his physical condition did not seem improved. The witness asked Turner several questions, but his condition was such the witness thought he was unable to transact any business. Witness did not think at that time he was competent to understand the nature of the release and all its terms and conditions. All he had to judge his mental condition by was his appearance, utterances or groans. He said nothing the witness could understand and witness could not be positive as to the condition of his mind.

If defendant in error was mentally capable of knowing and understanding what he was doing and did know he signed a release it could not be impeached in an action at law, but a court of equity would have to be resorted to to impeach the release before the action at law could be prosecuted. If he was mentally incompetent of knowing what he was doing or was deceived or tricked into signing the release when he thought he was signing something else, this could be shown in an action at law and would not be a bar. (*Papke* v. *Hammond Co.* 192 Ill. 631, and cases there cited; *Gerard* v. *St. Louis Car Wheel Co.* 123 Mo. 358; 45 Am. St. Rep. 556; *Chicago West Division Railway Co.* v. *Mills,* 105 Ill. 63.) Here there was no attempt to show defendant in error was induced by misrepresentation of the nature and character of the instrument, or by any trick or deception, to sign the release under the belief that it was something else, but the court erroneously submitted this question to the jury by a special interrogatory and the jury answered

that it was so procured. Overholt, Dr. Meriweather and Muncie testified in the most direct terms of the soundness of mind of defendant in error; that he conversed intelligently about the settlement and release and fully understood what he was doing; that he acted voluntarily and willingly, and they deny that Dr. Meriweather threatened to quit treating him if he did not settle. But we think the testimony of defendant in error himself conclusively shows he signed the paper as a settlement of any claim he had against plaintiff in error for his injury and knew and understood what he was signing at the time. Upon that question the evidence cannot be said to be in conflict. It is true, he was severely injured and was in a distressing physical condition when the release was signed, but no other understanding can be reasonably gained from his own testimony than that he knew he was making a settlement of any claim he might have against plaintiff in error. Under all the authorities, then, the release would be a bar to the action. If there had been any evidence tending to show lack of mental capacity in defendant in error to understand what he was doing, then the question would have been one of fact for submission to the jury; (*Chicago City Railway Co.* v. *Uhter,* 212 Ill. 174;) but where, as here, it is shown by the releasor's own testimony that he did understand what he was signing and that it was a settlement of his claim, no question of fact is raised for determination by the jury, and under the evidence in this record plaintiff in error was entitled to have the jury so instructed.

The judgments of the Appellate and circuit courts are reversed and the cause is remanded.

*Reversed and remanded.*