134    APPELLATE COURTS OF ILLINOIS.

Clark v. American Bridge Co. of New York, 180 Ill. App. 134.

## Albert C. Clark, Appellee, v. American Bridge Company of New York, Appellant.

1. RELEASE—*effect*. A release signed by an employe injured, in full settlement of his claim, with full mental capacity to understand the nature of the transaction and what he is doing, bars his action and a verdict for defendant should be directed.

2. RELEASE—*validity*. Evidence held to show that a release was valid.

Appeal from the City Court of East St. Louis; the Hon. MORTIMER MILLARD, Judge, presiding. Heard in this court at the October term, 1912. Reversed and remanded. Opinion filed April 23, 1913.

WISE, KEEFE & WHEELER and WILLIAM BEYE, for appellant; KNAPP & CAMPBELL, of counsel.

F. C. SMITH, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

This is an action in case brought by appellee, Albert C. Clark, against the appellant, The American Bridge Company of New York, to recover damages for an injury received by him on January 5, 1912, while in the employ of the appellant.

The declaration consisted of one count alleging that the plaintiff was in defendant's employ in the capacity of switchman; that his duties required him to ride on a certain locomotive engine; that the defendant negligently had provided an engineer to operate said locomotive engine who was inexperienced and incompetent for that kind of service; that the plaintiff had complained to the master mechanic who had control of the said engineer that said engineer was inexperienced and incompetent and plaintiff was ordered by said master mechanic to continue at his work and that said master mechanic promised to make a change of engineers; that pursuant to said order and in pur-

suance of such promise he did continue at the said work; that by reason of said engineer's inexperience and incompetency, not understanding the signals given him he ran said engine back on the inbound track instead of taking the cross over to the outbound track, by reason whereof the engine was made to collide with an inbound engine, resulting in injuries to the plaintiff.

Defendant filed a plea of not guilty. The case was tried by the court and jury, and resulted in a judgment against the defendant, from which this appeal is prosecuted.

It appears from the evidence in this case that the plaintiff was about sixty-four years of age; that he had been employed in railroad work as a switchman and conductor for forty-three years; that for about one year prior to the accident he was employed by the defendant as a switchman; that the crew working with him consisted of an engineer and fireman and a switchman (who was the plaintiff); it was the duty of the plaintiff as switchman to give all directions for the movement of the engine. It appears that the Southern railroad had two main tracks which ran into the north end of the yards used by the defendant; these tracks ran substantially in a north and south direction; the west track was known as the inbound track and the east track was known as the outbound track; engines running south should take the left hand or inbound track; engines running north should take the right hand or outbound track.

On the morning of the accident the plaintiff, who was the switchman in charge of the engine, had occasion to go to the warehouse for some knuckle locks. To reach this warehouse he intended to go along the southern tracks, from defendant's yards to the warehouse, which was located some considerable distance to the north of the crossings of the Illinois Central and Southern Railway tracks. Plaintiff told the engineer

where he was going; he gave the signal to the engineer to go north along the inbound track. Going north along the inbound track was against the current of the traffic; the engine should be under control so that it could be stopped by the engineer within half the distance of the vision of the engineer on the track or that the engine should be flagged by a switchman preceding the engine so that warning could be given in time to avoid danger. At the direction of plaintiff the engine started about 1,000 feet from the cross over; it was backing up; plaintiff was on the head footboard of the engine. The engine attained a speed of from ten to twelve miles an hour until some distance from the cross over when the speed of the engine was slackened by the engineer. When about one hundred feet from the cross over, the engine being still on the inbound track, plaintiff says he gave the signal to cross over, which signal was a wave of the hand. In order for the train to cross over from the inbound to the outbound track it was necessary to switch at the cross over at its connection with the inbound track. To do this it was necessary for the engine to stop so that the plaintiff could get off and throw the switch. The signal which was given by the plaintiff, was the wave of the hand, which was the signal to cross over. Immediately thereafter the speed of the engine was increased again to about ten or twelve miles an hour. About one hundred feet to the north of the cross over and some two hundred feet from where the plaintiff says he gave the signal to engineer, the in and outbound tracks were covered with smoke, steam and a heavy fog, which came from the rolling mills operating just west of the tracks. The engine was running at about ten or twelve miles an hour through the smoke, steam and fog on the inbound track.

The evidence shows that the atmospheric conditions were so dense that a man could not see his hand before his face. The engine continued to run about nine

hundred feet where it collided with an engine of the Southern railroad which had been coming south on the inbound track, but was then stationary, a little distance south of the crossings of the Southern and Illinois tracks. The evidence shows that the plaintiff was standing on the footboard of the engine and was thrown against the engine by the impact of the collision and so received the injury complained of. The plaintiff says that before the collision he tried to attract the attention of the engineer by hallooing at him, but was unable to do so; that he was endeavoring to notify the engineer to stop.

The injury to plaintiff occurred on January 5th. The evidence shows that he was taken to the hospital where he remained for a few weeks. While in the hospital the wages which plaintiff had earned prior to the accident, including the first week in January, were paid to him by the time keeper of the defendant.

The injuries to plaintiff consisted of blackened eyes, an injury in the back of the head, two teeth knocked out, rib broken, and a shoulder out of place. He returned to work as switchman on the 20th of March.

The evidence concerning the alleged negligence of the defendant on account of the incompetency of the engineer is conflicting. In view of the opinion we have on another question presented by this record and which we deem decisive of the case, we will not enter upon a discussion as to the sufficiency of the evidence which is claimed to show the negligence of the defendant. The question referred to arises on the validity of the release signed by the plaintiff on the 14th day of February, 1912, and which was put in evidence by the defendant. The plaintiff does not deny the execution of the release.

The release is as follows:

"The undersigned having sustained certain injuries by reason of an accident, in which he received a contused and lacerated wound at the base of the skull, a badly contused jaw, lacerated right ear, fracture of the

138    APPELLATE COURTS OF ILLINOIS.

Clark v. American Bridge Co. of New York, 180 Ill. App. 134.

fourth rib and a badly contused right shoulder and back, over Scapula, which occurred on or about January 5th, 1912, at Municipal Bridge, St. Louis, Mo., hereby offers to accept Seventy-five and 08/100 ($75.08) Dollars, in full satisfaction of all damages sustained or hereafter to be suffered directly or indirectly by reason of such injuries.

In consideration of the sum of Seventy-five and 08/100 ($75.08) Dollars, to the undersigned in hand paid by or on behalf of American Bridge Co. of New York, the receipt whereof is hereby acknowledged, the undersigned, for himself, his heirs, executors and administrator, does hereby release and forever discharge said Company, its successors and assigns, and all persons and corporations whomsoever, from all claims and demands and all damages, whatsoever sustained or hereafter suffered, directly or indirectly by reason of injuries received in the casualty above referred to, or in any manner growing out of same; and hereby acknowledge full satisfaction for all damages sustained or suffered in the premises.

In Witness Whereof, the undersigned has hereunto set his hand and seal the 14th day of February, in the year 1912.

Signed, sealed and delivered in the presence of
S. T. JACKSON                A. C. CLARK (L. S.)
WM. F. DAVIS
CHAS. HAHN.''

The testimony of the plaintiff concerning the release is that Jackson, Davis, and Hahn came together, to his house on the day the release was signed; that he let them in the front room, where they sat down and talked with him about how he was getting along; that Mr. Hahn said to him, "Mr. Clark, I fetched you some money," and he handed me the check. I said, "I need it bad. I am glad to get it." "Now," he said, "sign for it and we will be going," and he pulled out a paper and handed it to me. I put on my glasses and tried to read it. I looked at it for

some time. I could not read it. Everything was blurred. I handed it back to him and said, ''I cannot read that.'' He said, ''Sign right here.'' I signed there. They folded it up and they all went and before they went I said, ''Now I am to get fifty-five per cent of my wages until I am able to work?'' Mr. Hahn says, ''Sure.'' Plaintiff claimed that he did not know he signed a release; that nothing was said to him about a release. On cross-examination the plaintiff was asked:

''Q. Whom did you ask to read it?

A. I didn't ask anybody to read it.

Q. You just simply took your pencil and signed the paper which he handed you?

A. I was taking the gentleman's word.

Q. Now, Mr. Clark, isn't it a fact when Mr. Hahn produced that release he said, ''Shall I read it to you?''

A. I don't remember him saying anything of the kind.

Q. Isn't it true that you went over there to a stand or mantel and got your glasses and put them on. Isn't that true?

A. No, I don't remember that because I generally have my vest on and have my glasses right in my pocket. I have been wearing glasses for not so many years. Before I was injured I wore glasses.

Q. When you read that over or looked at it, didn't you say, ''This amount seems kind of small?''

A. No, sir, I did not.

Q. Then when you did sign it, Mr. Clark, you understood you were signing something that on account of the injury you got was going to pay you fifty-five per cent of your wages; you understood that didn't you?

A. Yes, sir.

Q. And you understood that was going to be in full satisfaction until you could go to work again?

A. I was to get fifty-five per cent, of my wages until I was able to go to work.

Q.   And when you was able to go to work, was that the end of the trouble?

A.   Yes, sir.

Q.   And you so understood it?

A.   Yes, sir.

Q.   So that when these men came out and presented the paper you understood that because you got hurt and in settlement of it you got fifty-five per cent. of your wages until you were able to go back to work?

A.   Until I was able to go back to my usual vocation.

Q.   There was not anything said about "Usual;"— until you was able to go back to work.

A.   My work was switchman.

Q.   I am asking you what was said or not.   That was said, until you could go back to work?

A.   Yes, sir.

Q.   Mr. Clark, before you were given that seventy-five dollars and eight cents, isn't it true that they first requested you to be examined by a doctor?

A.   Yes, sir.

Q.   Didn't you go to St. Louis to see Mr. Madison?

A.   No, I didn't go there to see him.   They took me up to see him.   I was under Dr. Little's charge all the time.   Dr. Little told me that he thought by the first of March I would be able to take my job again; and that seventy-five dollars and eight cents was fifty-five per cent. of the wages up to the first day of March.

Q.   And you understood now in taking this seventy-five dollars and eight cents that that was fifty-five per cent of your wages whenever you could go to work again.   You had no other claim against the company— you understood?

A.   No sir.   I understood I was to get fif'y-five per cent of my wages until I was able to go to work and I am not able to go yet.

Q.   I want your understanding about it.   When

you signed the paper, you signed it with the understanding that that represented fifty-five per cent of your wages until you could go to work? Is that right?

A. Until I was able to go to work, I say, yes.

Q. You were not able to go to work on the first of March?

A. No sir, I was not. On the 20th I went to the job as watchman. I was watching for the American Bridge Co.

It further appears from the evidence that Hahn, one of the witnesses who signed the release offered in evidence, as representative of the defendant, called on the plaintiff while he was at the hospital and told the plaintiff that the company would pay him fifty-five per cent. of his wages up to the time he was able to work as his damages for that injury, and that plaintiff said, "It seemed pretty small for being bunged up that way."

Afterwards, Hahn, Jackson and Davis visited the plaintiff at his home and obtained the release, Mr. Hahn says: "We talked about various things—at first general topics—about the accident, the weather, etc. Then I handed Mr. Clark the release and told him I had some money for him and the release which I wished he would sign and asked him whether I should read it to him or whether he would read it. Mr. Clark said he would read it. I do not know whether he said it in so many words—at least he signified it by taking the release, and he got his glasses and he looked at it like this—took him three or four minutes. He just read it diligently and I did not say a word so as not to bother him; the three of us were silent so he did not have anything to disturb him. He did not say a word himself. As far as I could observe he read it over. When he read it over he said, 'I guess it is all right' or something like that. He then signed it and the three of us put our names to it as witnesses. I gave him the check for $75.08."

Wm. F. Davis testified he was in the employ of the American Bridge Company, in the shipment of material; "that he went with Mr. Hahn and Mr. Jackson out to the plaintiff's home; that he saw a standard form of release shown Mr. Clark there at the time and also a check; Mr. Hahn told the plaintiff that he had a release; this release was handed to Mr. Clark; Mr. Hahn told Mr. Clark he would read it to him if he could not read. Mr. Clark took the release, however, walked to the west side of the room, took a pair of glasses either from the mantel or small table. He sat down in the middle of the room and looked at the paper." "Whether he read it or not I can't say. He certainly was in a position of a man reading. After looking for a few minutes, Mr. Clark asked for a pencil and signed it. Then Mr. Hahn gave him the check attached to the release." "We were there I should say forty-five or fifty minutes. During that time we had considerable conversation before the release was handed to him regarding the work at the bridge, the accident, and one thing and another about the working down in the yards." "That the plaintiff said he thought he would be back to work but did not think he would be back to work by the first of March; he seemed to think it would take a week or so longer. There was nothing done there at the time to induce Mr. Clark to sign the release."

On cross-examination the witness Davis said, "Mr. Hahn requested him to go out to the plaintiff's. I understood Mr. Jackson was going. We had the same office. The check was filled out at Hahn's office and the signatures were put in at Clark's residence. I had never been at Clark's house before. The only reason I went was to be a witness. The $75, in payment of the release came from the casualty department of the bridge company. It is paid any employe that is injured and is not able to work for the first ten days; they pay fifty per cent. and five per cent. for each child under sixteen until they are able to go

to work. The plaintiff went to the mantel or small table directly below the mantel. He did not say anything about his not being able to read it because his eyes blurred.''

The other witness to the release, Mr. Jackson, testified that he was in the employ of the bridge company; that his position was that of time keeper; that he went with Hahn and Davis and saw Mr. Clark the plaintiff; in his own home on February 14th. During the conversation the plaintiff stated that he thought he would be able to come back to work in· about a week; that Hahn told the plaintiff that he had some money for him; plaintiff replied he would be glad to get it; that he could use it to good advantage; that Hahn handed the release to the plaintiff for him to read; plaintiff got up and went to the mantelpiece and got his glasses and read the paper; that he mused over it three or four minutes anyhow. After he had read it over he asked if we had a pencil to sign it. Mr. Hahn gave him a pencil and he wrote on the back of a picture that he took off the little table near the front window. The plaintiff said that the amount was kind of small ·for the accident. We were there thirty or forty minutes. On cross-examination this witness was asked:

''Q. And didn't Mr. Clark take this over to the mantel and didn't he tell you that he could not read it?

A. No, sir, he did not.

Q. Did he read it?

A. Yes, sir.

Q. Did you see him read it?

A. He held it up to his face like a person would ordinarily read it.

Q. Didn't you know he could not see it at that time?

A. Mr. Clark has signed a pay roll every two weeks.

Q. Do you believe he was in his right mind when you were talking to him?

144    APPELLATE COURTS OF ILLINOIS.

Clark v. American Bridge Co. of New York, 180 Ill. App. 134.

A. Yes, sir.

Q. Isn't it a fact that when he told you he could not read it you told him it was all right, to just put his name down there?

A. No, sir.

Q. Did anybody tell him that?

A. No, sir."

We have set out at considerable length the testimony of the witnesses concerning what transpired at the plaintiff's home at the time he signed the release. If the appellee was mentally capable of knowing and understanding what he was doing and did know he signed a release, then such release cannot be impeached in this action. In such case before an action at law could be prosecuted resort would have to be had to a court of equity to impeach or set aside the release. If the evidence was sufficient to show the appellee was mentally incompetent to know or understand what he was doing or that he was deceived or tricked into signing the release when he thought he was signing something else, then such facts could be shown in an action of this kind and the release would not be a bar. *Turner v. Consumers' Coal Co.*, 254 Ill. 187. See also *Papke v. Hammond Co.*, 192 Ill. 631, and cases there referred to.

The evidence in this case wholly fails to show that there was any attempt on the part of Hahn, Davis and Jackson to misrepresent the nature and the character of the instrument or that any trick or deception was resorted to to obtain the signature of the appellee to the release under the belief that it was something other or different. Counsel for the appellee make no claim whatever that appellee was incompetent to know and understand the meaning of the paper he signed, nor is it claimed that he did not sign the release voluntarily and willingly. We think the testimony of the appellee himself shows conclusively that he signed the paper in full settlement of any claim he had against

the appellant for his injury and that he knowingly understood what he was signing at the time. There is little room for doubt upon that question when all the evidence is considered.

Under this view of the case we hold it was error for the trial court to refuse appellant's instruction to direct a verdict in its favor. The holdings of the courts of review are practically a unit that in such a case the release would be a bar to the action. If the evidence had tended to show a lack of mental capacity on the part of the appellee to understand the nature of the transaction and what he was doing a question would have been presented requiring its submission to a jury. *Chicago City Ry. Co. v. Uhter*, 212 Ill. 174.

In this case the appellee did understand he was signing a paper which was in full settlement of his claim. He understood that the settlement was based on the probability of his being able to go to work about the first of March; that by this settlement he was getting fifty-five per cent. of his wages up to the first of March; that his doctor told him he would be able to return to work about the first of March, and that $75.08 was fifty-five per cent. of his wages up to that time. With this release in evidence there was no question of fact arising from the evidence which should have been submitted to the jury for its determination and under the evidence the appellant was entitled to have the peremptory instruction asked.

The judgment of the City Court of East St. Louis is reversed and the cause remanded.

*Reversed and remanded.*