Warner Klettke, Plaintiff-Appellee, v. Checker Taxi Company, Inc., a Corporation, and Joseph Weglarz, Defendants-Appellants.

Gen. No. 47,913.

First District, Third Division.

June 29, 1960.

Rehearing denied August 4, 1960.

Jesmer and Harris, Michael A. Gerrard and Allen S. Gerrard, of Chicago (Julius Jesmer, Michael A. Gerrard, and Allen S. Gerrard, of counsel) for appellants.

Sennet and Levin, and Harry B. Aron, of Chicago (Harry B. Aron, of counsel) for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

In this personal injury case a verdict of $8,000 was returned against the Checker Taxi Company and its driver, Joseph Weglarz. The defendants contend there was no proof of their negligence; that the plaintiff was guilty of contributory negligence as a matter of law, and that the manifest weight of the evidence established the validity of a release received from the plaintiff; they complain that the plaintiff's attorney's closing argument and his conduct during the trial were prejudicial and caused the jury to return an excessive verdict.

Klettke, a pedestrian who was 57 years of age at the time of the accident, was struck by the defendants' northbound cab at Broadway and Balmoral Avenues, Chicago, an intersection without traffic signals. Broadway runs north and south, Balmoral east and west. Klettke testified he had looked both ways, and had seen no vehicles close to him, before walking west across Broadway in the crosswalk on the north side of Balmoral. As he neared the center of Broadway he again looked and saw a van truck approaching from the south and two vehicles coming from the north. He waited at the east edge of the northbound streetcar tracks for the traffic to clear; as he looked to his right at the vehicles from the north and was turned toward the northwest, the van passed behind him and then the cab, which also came from the south and which he had not seen, passed in front of him. The handle of the car door caught his left arm tearing it severely and throwing him several feet to the north. The plaintiff theorizes that he did not see the

cab because it was behind the van. There was no direct testimony that the cab was following the van. However, a passenger in the cab, in a pretrial statement which was referred to for purposes of impeachment, said she remembered a truck being directly in front of them.

The driver testified Klettke slammed into the rear of the cab after darting out from between two cars parked north of the Balmoral crosswalk, and that the first time he saw him he was 15 or 20 feet north of the crosswalk. The passenger said Klettke came from between the two cars parked north of the crosswalk and walked into the side of the cab. Both said the cab was traveling on the northbound streetcar tracks at the time.

In evaluating the defendants' argument that the manifest weight of the evidence established their lack of negligence and the plaintiff's contributory negligence, other testimony and circumstances must be considered. Two police officers talked to the driver and examined the cab after the accident. One was called as a witness by the plaintiff and one by the defendants. Both said they observed brush marks on the front door and on the side of the cab. The driver had testified that the rear door handle was broken; neither police officer mentioned this. The testimony was that the front handle protruded forward and the rear handle backward, "like the lapels of your coat." Both officers testified that the driver told them that Klettke was within the crosswalk when struck and that he had not seen him before the accident. Also, during cross-examination, the driver said he did not see him before the contact with the cab.

The plaintiff, a coal hiker, worked for a coal company which had its office on the south side of Balmoral, a few doors east of Broadway. In going home from work he took a southbound Broadway streetcar

from a safety island at the northwest corner of Balmoral. When he finished work this day at 4:30 p. m. he walked west from the coalyard to the southeast corner of Balmoral and Broadway. After observing the traffic he crossed Balmoral from the south to the northeast corner. The jury may have thought it was more reasonable to believe that he crossed Broadway at that point rather than to have gone beyond the corner and then to have turned west between parked autos. The defendants' theory is that he hurriedly cut northwestward across Broadway to reach the north end of the safety island to board a southbound streetcar. In their brief they say that Klettke saw his streetcar coming a block away. However, the evidence was that no streetcar was in sight.

Another circumstance must be mentioned. The driver testified there were two lanes of traffic and one parking lane between the northbound streetcar tracks and the east curb. The jury may have reasoned that if the plaintiff came out from the parking lane he would have had to travel a number of feet before getting to the streetcar tracks, where all acknowledge the accident occurred, and that, therefore, the driver would have had the time and the opportunity to have avoided the accident, had he been maintaining a proper lookout.

 We cannot say that the plaintiff was guilty of contributory negligence as a matter of law. The defendants argue that the controlling rule in this situation is that the law will not tolerate a person saying he looked and did not see an object, when if he had looked he would have seen it. This rule has been applied in several cases, notably those involving railroad crossings where the plaintiff had an unobstructed view of an approaching train. The rule has no application under the facts of this case where the jury could have believed that the object to be seen was

concealed until it was almost upon the plaintiff. The failure of a pedestrian to keep a continuous lookout after he has reasonably and cautiously entered upon a street is not contributory negligence as a matter of law. Moran v. Gatz, 390 Ill. 478, 62 N.E.2d 443. The conflicting evidence made it necessary for the jury to determine if the plaintiff contributed to his injury or if the defendants, by failing to keep a proper lookout, sounding a horn, yielding the right of way, or otherwise negligently operating the cab were solely guilty of the negligence which caused the injury.

The defendants' answer affirmatively alleged a release given by the plaintiff. The plaintiff's reply stated he had no recollection of signing a release, but if he did it was because of untrue representations, and was obtained while he was in pain and under the influence of opiates, which deprived him of his mental faculties and made him incompetent to contract. There were no preliminary motions and the issue was submitted to the jury.

Following the collision the driver discharged his passengers and drove the plaintiff to a hospital. Klettke was in the operating room about two and one-half hours. His arm was put into a freezing solution and he received four injections. He was awake, but felt nothing, while his arm was operated on and while 42 stitches were applied to the inside tissues and 20 to the outside.

The two police officers and an adjuster for the cab company awaited him in the hospital lobby, which he entered about 7:30 p. m. After talking to the policemen, he left the hospital with the adjuster who bought him something to eat. According to the adjuster a settlement was negotiated in the car after they left the restaurant and returned to the scene of the accident. The adjuster and his court reporter said that

Klettke was alert, bargained for a better deal, raised the settlement from $200, which was first offered, to $300 and the hospital bill, signed the release and endorsed a check, asked that the check be cashed, and when it was, put the money in his pocket. Klettke testified he felt dazed as he left the hospital; that after eating, the adjuster sat him in the car, and he lost consciousness. He said the adjuster later left to make a telephone call. As he sat alone in the car he was in pain and was cold. The adjuster returned, placed some money in his pocket—he didn't know how much because it was dark in the car—and later, after Klettke had come to after having passed out a second time, the adjuster took the money back. He said he did not remember signing either the release or the check, did not remember anyone else being with the adjuster, did not agree to settle his claim and he did not keep any money.

There were two witnesses against Klettke and both instruments bore his signature. The release was headed by the words "FULL RELEASE AND SETTLE-MENT" in large type. However, in this instance there also is additional evidence to consider. One policeman said that as Klettke came down from the operating room several white-uniformed people were in the same elevator and some of them were holding him up. As they started to lead him out of the elevator the officer stepped up and assisted him to a chair. The officer said his eyes were not focusing correctly, some of his answers were direct and some vague, that he tried to sign the statement but just couldn't do it. The second officer, the defendants' witness, testified the answers were not distorted and that Klettke's mental condition was normal. He admitted, however, that he had previously said Klettke had tried to sign his name but couldn't.

347

■ Although there was no proof of false representations, there was evidence tending to confirm the plaintiff's contention that he was incapable of entering into a contract. The circumstances surrounding the execution of the release brought within the jury's province the question of whether the plaintiff was capable of comprehending the effect of the document he signed. It was for the jury to decide if the parties were on an equal plane or if the defendants had an advantage and used it to overreach the plaintiff. The corralling of the plaintiff shortly after he left the operating room, the securing of the release so soon thereafter and the effect of shock, pain or sedatives upon his understanding were all questions for the jury in determining if his assent to the release was given while he was under mental disability or physical incapacity. Turner v. Manufacturers' & Consumers' Coal Co., 254 Ill. 187, 98 N. E. 234; Brinker v. Chicago Transit Authority, 344 Ill. App. 479, 101 N.E.2d 614; Chicago Union Traction Co. v. Ludlow, 108 Ill. App. 357.

There was some bickering during the trial and sometimes a failure to promptly observe the judge's rulings, but both attorneys were guilty of the same practice and the actions of the plaintiff's counsel were not of the prejudicial character ascribed to them. The criticism of his argument seemed, at first blush, to have greater merit. It was pointed out that he used the following expressions in an effort to contrast the power and wealth of the defendants with the weakness and poverty of the plaintiff: "the strong have taken advantage of the weak"; "we don't have the same facilities that the taxi company has," and "a major taxi company." In their actual contexts, however, the expressions were without the imputed connotation.

348

While speaking about the release the plaintiff's attorney said: "Since time immemorial the strong have taken advantage of the weak and I suggest to you that they have taken advantage of Mr. Klettke." The gist of his argument on this subject had been that Klettke was in no condition to contract and had been imposed upon. In this association the remark was not an attempt to arouse prejudice against the corporate defendant. Furthermore, the court instructed the jury to entirely disregard the statement.

An investigator for the cab company had taken a statement from the passenger. The plaintiff's attorney had interviewed her also. The defense counsel mentioned this interview three times during his argument. In responding the attorney for the plaintiff explained that he had no investigator and that he had to question her himself. He said: "We don't have the same facilities that the taxi company has." This explanation was simple and harmless.

The reference to the defendant as a major cab company was likewise harmless. It is a matter of common knowledge that the Checker Taxi Company is one of the two major cab companies in this community. No improper emphasis was placed upon this fact; the word "major" was used descriptively only. The word was used twice. The first time there was no objection; the second time, upon objection, the court instructed the jury to disregard it.

■ ■ There is nothing about the balance of the argument which could be termed prejudicial. The argument was temperate, especially so considering the fact that it was interrupted some 25 times, frequently by ill-founded objections and sometimes by asides, the latter leading to a reprimand by the trial judge, who admonished the defendants' attorney to desist. We find no misconduct on the part of the plaintiff's attorney,

which could have influenced the jury in reaching the amount of its verdict. The verdict was not excessive in view of the plaintiff's loss of earnings and injury. The judgment will be affirmed.

Affirmed.

SCHWARTZ and McCORMICK, JJ., concur.